# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**DEONTAYE TERRELL LUSK,**
        **Petitioner,**

    **v.**                             **Case No. 20-C-0463**

**WARDEN DYLAN RADTKE,**
        **Respondent.**

## DECISION AND ORDER

Deontaye Lusk petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He brings claims for ineffective assistance of trial and postconviction/appellate counsel and contends that any procedural default of his claims should be set aside on the ground that he is actually innocent.

## I. BACKGROUND

Following a single jury trial, Lusk was found guilty and convicted of thirteen crimes, including two counts of first-degree intentional homicide. The charges stemmed from a series of armed robberies that occurred between April 9, 2009 and July 12, 2009 in the City of Milwaukee. Lusk's habeas claims focus on the convictions that arose out of two distinct incidents: (1) the attempted robbery and murder of Eric Garrett, which occurred in the early morning hours of June 21, 2009, and (2) the robbery of Jugady Banks and the murder of John Brown, both of which occurred early on July 12, 2009 outside of a tavern or club called the Plan B. I will provide factual details for these events only.

At about 2:00 a.m. on June 21, 2009, several youths were socializing in and around their parked cars on a neighborhood street when two men approached. One of them confronted Eric Garrett and asked him what he had in his pocket. When Garrett said

"nothing," the person shot him in the chest. Garrett died of the gunshot wound. At trial, three eyewitnesses—Kimberly Neal, Jessica Garrett, and Brittany Pendelton—identified Lusk as the shooter. Prior to trial, these three witnesses also identified Lusk during police-conducted lineups. According to the trial court's docket, Lusk's trial counsel filed motion to suppress the identifications made by these witnesses, but the trial court denied the motion. (Answer Ex. 1-A, entry for July 23, 2010; ECF No. 16-1.) The federal record does not contain a transcript of the suppression hearing or information about the parties' arguments or the court's ruling, other than the following entry on the docket:

> Matter in court for the Court's Decision on defense motion challenging identification of State's witnesses. Court finds that the State has met the identification challenge as far as witness Ms. Kimberly N. The Court will allow the testimony of Ms. Kimberly N. in at trial. As for witness, Ms. Jessica G., the court finds her identification of the defendant to be reliable. Court will allow the testimony of Ms. Jessica G. at trial. Court finds that Ms. Brittany P.'s identification of defendant was very positive. Court denied defense motion to suppress the identification of Ms. Kimberly N., Ms. Jessica G., and Ms. Brittany P. They will be allowed to testify at trial.

(*Id.*) At trial, all three witnesses identified Lusk in court, and the state introduced Garrett's and Pendelton's out-of-court identifications. The state, however, did not introduce evidence of Neal's out-of-court identification. The jury convicted Lusk of all crimes that were charged in connection with the murder of Eric Garrett.

The other relevant crimes occurred on July 12, 2009. At about 2:00 a.m., a person named Katie Dean exited the Plan B Tavern with her nephew, Jugady Banks. At trial, Dean testified that Banks went to his car ahead of her and that, when she arrived at the car, she noticed that a man was patting Banks down with a gun and that another man was leaning against the car. She saw two other men she believed were involved in the robbery. Dean identified one of the men as Lusk and another as Timothy Carter. Dean

testified that she had seen Lusk inside the Plan B earlier that evening. She testified that Carter was the man with the gun. The state also introduced evidence that, prior to trial, Dean had identified Lusk after the police showed her a photo array. Dean testified that, during the robbery, Lusk took a pack of cigarettes that he found in Banks's pockets. The men then advised Banks to drive away before they started shooting. Banks told Dean to get in the car, and after she did so they drove away. Dean testified that, as they were driving away, she heard gunshots coming from the Plan B.

At about this time, the events surrounding the murder of John Brown were unfolding. Just prior to the murder, Brown was sitting in the passenger seat of a truck that was double parked on the street near the Plan B. The truck belonged to Anthony Heard, who was in the driver's seat. Heard had just driven Brown to the Plan B because his car was parked in its parking lot. Heard and Brown were talking with each other in the truck when they heard a gunshot coming from the parking lot. Heard testified that a group of young men were in the lot, and that one of them had just fired a shot. Heard asked Brown what he wanted to do, and Brown said that he wanted to go to the lot and get his car. After Heard confirmed that this was really what Brown wanted to do, Heard drove his truck into the lot, near the group of young men. Brown exited the vehicle and was immediately confronted by the group. Heard testified that Brown told one of the men that he was just going to his car. Heard then saw the man point his gun at Brown and shoot. At this point, Heard drove away. Brown died from the gunshot wound.

Heard did not identify the person who shot Brown. However, the testimony of Katie Dean, which identified Lusk as one of the men who had robbed her nephew moments earlier, put Lusk at the scene of the crime. Likewise, the owner of the Plan B, Nicole

3

Tanner, testified that Lusk had been inside the tavern that evening and left at around the time the bar closed, which was when Banks was robbed and Brown was killed. The state then presented the testimony of Dennis Avant, who claimed to witness Lusk shoot Brown. At the time of trial, Avant had been convicted of eleven felonies and was being prosecuted for an open drug offense. He testified that, although he was not promised anything in exchange for his testimony, he agreed to testify against Lusk in the hopes that the prosecution would take his cooperation into consideration in his drug case. On cross-examination, Avant said that the open drug case began when he was arrested by a police officer named Michael Vagnini. Although unknown at the time of Lusk's trial, it was later revealed that Vagnini was performing illegal body-cavity searches on suspects. After the illegal searches came to light, Vagnini was dismissed from the police force and criminally prosecuted. Avant testified that, after Vagnini arrested him, Avant told Vagnini that he had information about Brown's murder, and that Vagnini arranged for him to speak with detectives from the homicide unit.

Avant testified that, at about 2:00 a.m. on July 12, 2009, he was at the Plan B and saw Lusk and Timothy Carter there. Avant said he knew both men before that night. He testified that, when he left the Plan B and was going to his car in the parking lot, he saw Lusk and Carter in a group of about four people and that they were arguing with a man and possibly trying to rob him. Avant testified that he saw Carter shoot a gun into the air and then give the gun to Lusk. Avant testified that Lusk told the man to "break his self," which Avant understood to be a demand for the man to give Lusk his valuables. According to Avant, when the man told Lusk he had nothing, Lusk shot him. Avant said that Lusk

4

and Carter then entered a truck and drove away. Avant testified that he walked up to the victim, looked at him, and then got into his own car and drove away.

The state also called Antwan Green to testify against Lusk. At the time of trial, Green had been adjudicated a juvenile delinquent eight times and was then in custody. He testified that, following his arrest on August 2, 2009, he agreed to talk to the police about Lusk. Green testified that, on the night of Brown's murder, he was out with some of his friends when the group received a call from Lusk at about 2:45 a.m. The group went to meet Lusk, and Green claimed that when they arrived Lusk told them that he had shot someone. However, after Green finished testifying, it was discovered that he was in a juvenile correctional facility on the night Brown was shot and therefore could not have met Lusk on the street that night. Green was still at the courthouse at the time of this discovery, and the court arranged for the public defender to represent him on possible perjury charges. After counsel was appointed, Green returned to the stand and, in front of the jury, admitted that his testimony was false. Green then invoked his Fifth Amendment right against self-incrimination. During closing arguments, the prosecutor admitted that Green had committed perjury and apologized to the jury for presenting his false testimony.

As a result of the events that occurred during the early morning of July 12, 2009, Lusk was charged with robbery with threat of force, first-degree intentional homicide by use of a dangerous weapon, and being a felon in possession of a firearm. The jury convicted him of all counts.

On direct review in state court, Lusk was represented by Attorney Matthew Pinix. In Wisconsin, direct review often begins with the filing of a postconviction motion in the

trial court. In such a motion, the defendant can raise claims of ineffective assistance of trial counsel and other claims that might require an evidentiary hearing. Once the postconviction motion is resolved, the defendant may appeal to the Wisconsin Court of Appeals. However, if the defendant does not intend to raise issues on appeal that might require an evidentiary hearing, then a postconviction motion is unnecessary and the defendant may proceed with an appeal.

On December 15, 2011, while Pinix was investigating possible issues to raise in a postconviction motion or on appeal, Pinix wrote a letter to Lusk in which he mentioned that Lusk had previously sent him a "notarized letter" from Antwan Green. (Pet'r's Ex. 2; ECF No. 18-1.) The letter from Green in not in the record, and Pinix does not describe its contents in his own letter. However, Pinix told Lusk that he was requesting an extension of time with the court of appeals so that he could meet with Green to determine whether Green's "position in the letter" would support a postconviction claim. (*Id.*) Nothing in the federal record indicates whether such a meeting occurred or, if it did, whether Green provided Pinix with information helpful to Lusk's postconviction proceedings. In his habeas brief, Lusk states that Green's notarized letter claimed that Officer Vagnini had "coerced him to falsely testify that Greene had witnessed Lusk shoot Brown." (Pet'r's Br. at 12; ECF No. 18.) As noted, however, Green did not testify that he witnessed the shooting, only that Lusk had told him about it afterwards.

On August 3, 2012, Pinix sent Lusk a copy of the appellate brief he filed on his behalf, along with a cover letter. (Pet'r's Ex. 4; ECF No. 18-1.) The cover letter explained that Pinix chose to present two claims: (1) that the joinder of all charges in a single trial was improper, and (2) that Katie Dean's identification testimony should have been

6

excluded due to an improper out-of-court identification. Pinix stated that he decided not to include a separate claim based on Kimberly Neal's out-of-court identification because the state did not introduce evidence of the identification at trial.

On October 13, 2012, Pinix wrote a letter to Lusk responding to a letter that Lusk had recently sent. (Pet'r's Ex. 10; ECF No. 18-1.) Pinix wrote that Lusk's letter inquired "about an issue regarding Officer Vagnini." (*Id.*) Pinix did not further describe the issue. However, information about Vagnini's illegal strip searches had been made public earlier in 2012. Pinix reminded Lusk that his appeal was pending before the Wisconsin Court of Appeals, and he said that he did not see any reason to voluntarily dismiss the appeal rather than wait for a decision. Pinix advised Lusk that, if the appeal was unsuccessful, the Vagnini issue "might be a viable claim for [Lusk] to assert through a collateral attack pursuant to Wis. Stat. § 974.06 or some other procedural mechanism." (*Id.*)

A month later, on November 13, 2012, Pinix wrote another letter to Lusk, this time advising him about new information he received. (Pet'r's Ex. 5; ECF No. 18-1.) Pinix told Lusk that Dennis Avant had called him and told him that he wanted to share information about pressure put on him by Officer Vagnini to testify in Lusk's case. Pinix told Lusk that he had scheduled a meeting with Avant in his office for that day, and that his intention was to obtain an affidavit from Avant. However, when Pinix and Avant met face-to-face, Avant told Pinix that he did not want to make a statement until he had a chance to talk to his own lawyer. Avant then left without making a statement but told Pinix that he would get back to him within 45 days. Pinix told Lusk that he believed that, if Avant talked to a lawyer, the lawyer would advise him not to say anything further because he risked perjury

7

charges and a possible increase in his own criminal sentence. As far as the record reveals, Pinix never heard back from Avant.

In a decision dated July 16, 2013, the Wisconsin Court of Appeals rejected the two issues Pinix had raised on Lusk's behalf and affirmed Lusk's conviction. On January 15, 2014, the Wisconsin Supreme Court denied further review.

In 2015, Lusk collected a series of affidavits and statements from various witness, which he believes demonstrates that he is innocent of the crimes that occurred outside the Plan B on July 12, 2009. Lusk attaches copies of five statements and affidavits to his brief, and he describes a sixth affidavit in his brief but does not provide a copy. First, Lusk provides a statement from Adrianna Davis, who claims that Lusk was with her at a card party the entire night on which the Banks robbery and the Brown murder occurred. (Pet'r's Ex. 1; ECF No. 18-1.) Lusk claims that Davis and other members of her family would have been willing to testify at trial that he was at the party all night, and that Lusk's trial counsel filed a notice of an alibi with the trial court based on their testimony. However, according to Lusk, his trial counsel decided not to call these witnesses because they were related to Lusk. Lusk states that his trial counsel told him that "jurors don't believe family members." (Pet'r's Br. at 8; ECF No. 18.)

Second, Lusk provides an affidavit signed by Dennis Avant on May 20, 2015. (Pet'r's Ex. 6; ECF No. 18-1.) In this affidavit, Avant claims that his testimony at trial was false and that it was coerced by Officer Vagnini. Avant states that, after Vagnini planted drugs on him and arrested him, Vagnini pressured Avant to testify that he saw Lusk shoot Brown. Avant says that he was not at the Plan B when the murder happened and thus could not have seen the shooting. Nonetheless, Vagnini told Avant what to say in his

8

testimony. Avant states that he then met with homicide detectives, who told him where in the parking lot the shooting happened. Avant further states that Vagnini told him that, if he did not testify against Lusk, Vagnini would continue to harass Avant and "set [him] up with drugs." (*Id.*)

Third, Lusk provides an affidavit from a person named Toriano Leavell dated June 12, 2015. (Pet'r's Ex. 7; ECF No. 18-1.) Leavell states that, on numerous occasions in 2010, Officer Vagnini pulled him over and tried to persuade him to testify against Lusk about a murder that occurred at the Plan B. Leavell states that he told Vagnini that he knew nothing about the murder, but Vagnini continued to pull him over and provide him with information about the case. Vagnini even threatened to plant drugs on Leavell if he did not testify. However, Leavell did not testify at Lusk's trial.

Fourth, Lusk provides an affidavit from a person named Brandon Williams. (Pet'r's Ex. 8; ECF No. 18-1.) Williams states that, in 2014, he was incarcerated in the same correctional facility as Vagnini, who by this time had been convicted of the charges that arose out of the illegal strip searches. Williams states that, during a conversation, Vagnini told Williams that he had supplied Avant with some of the details about the Brown murder so that Avant would be able to testify against Lusk.

Fifth, Lusk provides an undated, unnotarized statement that purports to have been signed by Timothy Carter, Lusk's alleged accomplice in the robbery of Banks and the murder of Brown. (Pet'r's Ex. 9; ECF No. 18-1.) Carter states that he was the one who shot Brown in the Plan B parking lot and that Lusk was not even in the parking lot that night. Carter states that, in 2012, he tried to contact Lusk's lawyer (who I assume was

Pinix) to relate these facts, and that Lusk's lawyer contacted Carter's lawyer but not him. Carter further states that his own lawyer told him not to say anything.

Finally, in his brief, Lusk refers to an affidavit supposedly signed by a person named Brian Nash. (Pet'r's Br. at 16; ECF No. 18.) This affidavit is not in the record, but according to Lusk's brief, the affidavit states that Vagnini arrested Nash and tried to coerce him into falsely testifying against Lusk.

In November 2016, Lusk, proceeding pro se, filed a motion for postconviction relief in the state trial court under Wis. Stat. § 974.06. In the motion, Lusk alleged that he received ineffective assistance of both trial and postconviction/appellate counsel and that he was entitled to a new trial based on newly discovered evidence, namely, the affidavits and statements he had recently collected. The trial court denied Lusk's ineffective-assistance claims without holding an evidentiary hearing on the ground that his allegations were conclusory. However, the court granted Lusk an evidentiary hearing on his claim of newly discovered evidence insofar as it pertained to Dennis Avant's recantation. The court appointed counsel to represent Lusk for purposes of the hearing. With respect to Timothy Carter's statement, the court found that it did not contain an admission to the shooting, and thus the court denied relief on that claim before the hearing occurred.[1]

---

[1] As discussed above, the written statement from Carter in the federal record contains an admission to the shooting. Thus, it appears that the statement in the federal record is not the same statement that Lusk provided to the state courts.

10

The state-court docket indicates that the evidentiary hearing regarding newly discovered evidence was set to occur on December 4, 2017. (ECF No. 16-1.) The docket entry for that date reflects that Lusk and his appointed counsel appeared, but his witnesses did not. Because the witnesses did not appear, the court found that Lusk could not meet his burden to show that he was entitled to a new trial based on newly discovered evidence.

Lusk, now pro se again, appealed the denial of his Wis. Stat. § 974.06 motion to the court of appeals and raised the same claims he had raised in the trial court. The Wisconsin Court of Appeals rejected all claims and affirmed the denial of the postconviction motion. The court first determined that Lusk's claim that his trial lawyers were ineffective was procedurally barred under *State v. Escalona-Naranjo*, 185 Wis. 2d 168 (1994), because he had failed to raise them on direct review. Next, the court determined that the trial court properly denied Lusk's claim that his postconviction/appellate counsel was ineffective without a hearing because the postconviction motion did not comply with the pleading standard set out in cases such as *State v. Balliette*, 336 Wis. 2d 358 (2011), and *State v. Romero-Georgana*, 360 Wis. 2d 522 (2014). Finally, the court determined that the trial court had not erred in failing to grant Lusk a new trial based on newly discovered evidence. The court noted that the trial court had granted an evidentiary hearing on this claim but that, because Lusk did not obtain a transcript of the hearing, the court had to assume that the transcript would support the court's denial of the claim.

Lusk sought review of the denial of his postconviction motion in the Wisconsin Supreme Court, but his petition for review was denied.

Having exhausted his state-court remedies, Lusk now brings the present habeas petition under 28 U.S.C. § 2254. He alleges four grounds for relief, which he labels as follows: (1) newly discovered evidence; (2) ineffective assistance of trial counsel; (3) ineffective assistance of postconviction/appellate counsel; and (4) actual innocence. Within these grounds, Lusk asserts the same issues that he raised on collateral review in state court. Lusk does not pursue the issues that Pinix raised on direct review, *i.e.*, improper joinder and Katie Dean's suggestive identification.

During prior proceedings in this case, the respondent filed a motion to dismiss the petition. In that motion, the respondent argued that grounds one and four were not grounds on which the court could grant habeas relief and that Lusk had procedurally defaulted his ineffective-assistance claims. In response to the motion, Lusk conceded that grounds one and four were not freestanding claims for relief. Instead, he said, he intended to use the facts relating to grounds one and four to support his ineffective-assistance claims and to show that he qualified for the fundamental-miscarriage-of-justice exception to the procedural-default doctrine.

In an order dated October 29, 2020, I denied the respondent's motion to dismiss. *See Lusk v. Radtke*, No. 20-C-0463, 2020 WL 6361871 (E.D. Wis. Oct. 29, 2020). First, I construed grounds one and four of the petition not as freestanding claims for relief, but as aspects of Lusk's ineffective-assistance claims and his defenses to the respondent's charge of procedural default. As to procedural default, I concluded that Lusk's claims of ineffective assistance of trial counsel were defaulted because the Wisconsin Court of

12

Appeals rejected them under *Escalona-Naranjo*, which is an independent and adequate state ground. However, I found that the claims involving postconviction/appellate counsel were not defaulted because the court of appeals relied on a state pleading standard that was not "independent" of federal law. *See Lusk*, 2020 WL 6361871, at *5. Finally, I noted that, because Lusk was claiming that he qualified for the fundamental-miscarriage-of-justice exception but the parties had not fully briefed that issue, further proceedings would be needed to determine whether the exception applied. I also directed the parties to address the merits of the defaulted claims in case I determined either that the default should be set aside or that it was easier to resolve the merits rather than fully adjudicate the procedural-default defense.

The parties have filed their briefs, and I now turn to the remaining issues in this case.

## II. DISCUSSION

### A.    Procedural Default: Respondent's Request for Reconsideration

In his brief, the respondent asks me to reconsider my conclusion that Lusk did not procedurally default his claims of ineffective assistance of postconviction/appellate counsel. Procedural default is an aspect of the independent-and-adequate-state-ground doctrine, which governs the Supreme Court's jurisdiction to directly review decisions by state courts. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Under that doctrine, the Supreme Court will not review a question of federal law decided by a state court if that court's decision rests on a state-law ground that is independent of the federal question and adequate to support the judgment. *Id.* The Supreme Court has expanded the doctrine to apply not only to its own review of state-court decisions, but also to any

13

federal court's review of the legality of a person's custody under a state judgment. *Id.* at 729–30. The habeas version of the doctrine (the procedural-default doctrine) generally bars federal review when a state court declines to address the merits of a prisoner's federal claims because the prisoner failed to meet a state procedural requirement. *Id.* However, there are two exceptions to the procedural-default doctrine. *See, e.g., Johnson v. Foster*, 786 F.3d 501, 505 (7th Cir. 2015). The first applies when the petitioner can establish cause for his default and show that he would suffer prejudice if the federal court refused to consider the merits of his claims. *Id.* The second applies when the petitioner shows that a failure to consider the federal claims will result in a fundamental miscarriage of justice. *Id.* This second exception applies only when the claimed constitutional violation probably caused the conviction of an innocent person. *Id.*

In my prior order, I concluded that Lusk did not procedurally default his claims of ineffective assistance of postconviction/appellate counsel because the Wisconsin Court of Appeals rejected that claim under a state-law pleading standard that was intertwined with the merits of the federal claims and thus not "independent" of federal law. *See Lusk*, 2020 WL 6361871, at *5. I reasoned as follows:

> A procedural ruling is not independent of federal law "when resolution of the state procedural law question depends on a federal constitutional ruling." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *see also Stewart v. Smith*, 536 U.S. 856 (2002). And here, the Wisconsin Court of Appeals made federal constitutional rulings in the course of determining that Lusk had failed to plead an ineffective-assistance claim that warranted a hearing. The court noted that, under *Strickland v. Washington*, 466 U.S. 668 (1984), Lusk was required to prove that his counsel's performance "was both deficient and prejudicial." ECF No. 10-2 at 5. The court then determined that the facts alleged in the motion did not "make the case" that his counsel's performance satisfied the *Strickland* standard. *Id.* The court also noted that, to prevail on a claim of ineffective assistance of appellate counsel, Lusk was required to show that the issues counsel failed to raise were "clearly stronger" than the

issues he did raise. *Id.* at 6. This "clearly stronger" test is itself based on federal law. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). The court found that Lusk had not demonstrated that the issues his postconviction counsel failed to raise were clearly stronger than the issues he did raise. *See* ECF No. 10-2 at 6. In short, the Wisconsin Court of Appeals applied federal standards governing ineffective-assistance claims to the facts alleged in Lusk's postconviction motion and determined that the facts alleged did not give rise to a viable federal claim warranting an evidentiary hearing. This was a ruling on the merits of the federal claim, not a refusal to consider the merits of the federal claim based on a state procedural rule. Thus, Lusk did not procedurally default his claims of ineffective assistance of appellate counsel that he raised in his state postconviction motion.

*Id.*

The respondent notes that, after I decided the motion to dismiss, the Seventh Circuit issued a decision finding that the Wisconsin pleading standard at issue is in fact "independent" of federal law for purposes of the independent-and-adequate-state-ground doctrine. *See Triplett v. McDermott*, 996 F.3d 825 (7th Cir. 2021). This case supports the respondent's position on procedural default. I also note that, after the parties filed their current briefs, the Seventh Circuit decided yet another case in which it found that Wisconsin's pleading standard is "independent." *Garcia v. Cromwell,* __ F.4th __, 2022 WL 731539, at *8 (7th Cir. 2022). I acknowledge that these decisions call into question my conclusion that Lusk did not procedurally default his claims of ineffective assistance of postconviction/appellate counsel. However, I decline to reconsider my conclusion in light of this new authority. That is so because, even if I reconsidered my conclusion and determined that Lusk had procedurally defaulted his claim of ineffective assistance of postconviction/appellate counsel, I would still have to consider whether the default should be set aside under the fundamental-miscarriage-of-justice exception. Further, as discussed below, all of Lusk's ineffective-assistance claims quite clearly fail on the merits.

15

Thus, rather than wade further into the procedural-default doctrine and the fundamental-miscarriage-of-justice exception, I will simply consider all Lusk's claims on the merits, as I am allowed to do. *See, e.g., Carrion v. Butler*, 835 F.3d 764, 772 & n.26 (7th Cir. 2016).

## B.    Ineffective Assistance of Trial Counsel

To establish a Sixth Amendment claim of ineffective assistance of counsel, Lusk must show that his counsel performed deficiently and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984). To establish deficient performance, Lusk must demonstrate that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *Id.* at 687. This requires showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* To establish prejudice, Lusk must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694.

Lusk argues that his trial lawyers were ineffective in two respects: (1) not calling his family members to provide him with an alibi for the night of the Banks robbery and the Brown murder,[2] and (2) not asking for either an adjournment of the trial or a mistrial once it was learned that Antwan Green had committed perjury.

### a.    Not calling alibi witnesses

Lusk faults his trial lawyers for not pursuing an alibi defense that they had investigated prior to trial. Several of Lusk's family members, including Adrianna Davis,

---

[2] This alibi would also have applied to an additional crime of which Lusk was convicted— the armed robbery of Dwaun Baily, which occurred a few hours before the events at the Plan B transpired. I have not discussed this crime because it is not otherwise relevant to the issues Lusk has raised.

whose affidavit is in the record, were prepared to testify at trial that Lusk was attending a card party at their house on the night of July 11–12, 2009, and that he eventually fell asleep and spent the entire night there. If the jurors believed this testimony, they would not have found Lusk guilty of the crimes that occurred that night because he was not at the scene of the crimes. Lusk states that his trial lawyers made a strategic decision not to call these witnesses based on their opinion that the jurors would not believe Lusk's family members. (Pet'r's Br. at 8; ECF No. 18.) Lusk disagrees with their decision.

Under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690; *see also Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable."). Here, *Lusk* concedes that his trial lawyers' decision not to call his alibi witnesses was made only after they investigated the alibi defense. Lusk also concedes that the decision not to call the witnesses was conscious, not the result of inattention. Thus, *Strickland*'s strong presumption of reasonableness applies.

Lusk cannot overcome this presumption. Lusk states that his trial lawyers opted not to call his family members as witnesses because juries generally consider family members to be biased and therefore not credible. The Seventh Circuit has recognized that this is a reasonable trial strategy. *See Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias."). Lusk disputes that the decision not to call his family members was reasonable in this

17

case, and he cites a case in which the Seventh Circuit found that counsel's decision not to call "two useful, corroborating witnesses, despite the family relationship," was deficient. *Toliver v. Pollard*, 688 F.3d 853, 862 (7th Cir. 2012) (quoting *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006)). But in *Toliver*, the court also emphasized that whether the decision was reasonable depends on "the context of the theories presented at trial." *Id.* In *Toliver*, counsel failed to call the only witnesses who would have corroborated the defense's theory. Here, in contrast, Lusk's lawyers decided not to offer an alibi for the night in question, so the failure to call these witnesses was not analogous to the situation in *Toliver*.

Moreover, Lusk's trial lawyers had sound reasons for not presenting an alibi defense. Several witnesses identified Lusk as being present at the Plan B on the night of the crimes, including Katie Dean, Dennis Avant, and Nicole Tanner, the owner of the tavern. The testimony of Lusk's family members would have been flatly inconsistent with the testimony of those witnesses. Although counsel could have attacked Dean's identification and the credibility of Avant's testimony (which they did), there was no clear way to impeach Nicole Tanner's testimony, which was very credible. Tanner testified that Lusk was a regular at the tavern and that she knew his nickname, Burns. (ECF No. 16-19 at p. 140 of 232.) She also credibly testified that she knew Lusk was at the tavern on the night of the crimes. Tanner explained that she had to close the tavern early that night because two female patrons were arguing and making a scene, and she remembered Lusk approaching her to tell her that he didn't have anything to do with the two women. (*Id.* at p. 139 of 232.) Thus, defense counsel had no plausible basis for arguing that Tanner was mistaken about seeing Lusk at the tavern that night. Given Tanner's

18

testimony, it was reasonable for trial counsel to focus on creating reasonable doubt as to whether Lusk was involved in the crimes rather than on trying to prove that he was not present at the Plan B on the night the crimes occurred.

Accordingly, Lusk has not shown that his trial lawyers performed deficiently by making the strategic decision not to call Lusk's family members as alibi witnesses.

### b. Failure to request mistrial or adjournment based on Green's perjury

Lusk next contends that his trial lawyers performed deficiently when, after learning that Antwan Green committed perjury, they failed to either request a mistrial or an adjournment of the trial. Lusk asserts that, had his lawyers requested a mistrial or an adjournment, they could have investigated Green and possibly learned about Officer Vagnini's alleged actions in pressuring witnesses to testify against him.

Initially, I note that I do not understand Lusk to be arguing that his lawyers should have requested a mistrial to ensure that Lusk received a fair trial. Instead, given Lusk's reference to requesting an adjournment in lieu of a mistrial, I understand him to be arguing that his lawyers should have requested a mistrial to buy time to investigate the circumstances surrounding Green's perjury. In any event, Lusk has not shown that Green's perjury prevented him from receiving a fair trial. Green's perjury was discovered during the trial, and he was recalled as a witness and admitted to the jury that he perjured himself. During closing arguments, the prosecutor acknowledged that Green committed perjury and apologized to the jury for calling him as a witness. If anything, Green's perjury aided the defense, in that it called the credibility of the state's case into question. Thus, trial counsel had no basis for requesting a mistrial, and the trial court almost certainly would not have granted one.

19

I turn, then, to the question of whether Lusk's trial lawyers performed deficiently by not requesting an adjournment to investigate Green. Here, Lusk seems to think that, had his lawyers immediately investigated Green's perjury, they would have uncovered Vagnini's alleged scheme to cajole witnesses into testifying against him. But this is pure speculation on Lusk's part. Once the perjury was discovered, Green was appointed counsel and invoked his Fifth Amendment right against self-incrimination. There is no evidence that Green would have told Lusk's lawyers or their investigator why he committed perjury or that he would have revealed anything that might have been helpful to Lusk's defense. Further, Lusk points to no other investigative steps that his lawyers could have taken once they discovered Green's perjury. Although Lusk claims to have provided his *appellate* counsel, Pinix, with a notarized letter from Green in which Green claimed to have been pressured by Vagnini, Lusk points to no evidence that Green would have disclosed the same information to his trial lawyers if they had interviewed him during an adjournment. In any event, Pinix told Lusk that he intended to interview Green, and Lusk does not claim either that Pinix failed to follow through on this intent or that he obtained useful information from Green. Thus, there is no evidence that any investigation of Green at any time would have revealed information helpful to Lusk's defense.

Accordingly, Lusk has not shown that his trial lawyers performed deficiently when they failed to request an adjournment to investigate the circumstances surrounding Green's perjury. Even if his trial lawyers could be found deficient in this respect, Lusk still could not show prejudice. Lusk has not demonstrated a reasonable probability that, had his trial lawyers requested additional time to investigate Green, they would have uncovered Vagnini's alleged scheme to pressure witnesses.

20

**B.      Ineffective Assistance of Postconviction/Appellate Counsel**

Lusk next contends that Matthew Pinix, his postconviction/appellate counsel, was ineffective in three respects: (1) not raising a claim based on newly discovered evidence, (2) not raising the claims of ineffective assistance of trial counsel that I discussed above, and (3) not raising a claim based on the out-of-court identifications of Kimberly Neal and Jessica Garrett. The first two claims challenge Pinix's performance in his capacity as postconviction counsel, and the third claim challenges his performance in his capacity as appellate counsel.

**1.      Claims Involving Postconviction Capacity**

**a.      Failure to bring postconviction motion based on newly discovered evidence**

Lusk's primary challenge to Pinix's effectiveness is based on his belief that, once Pinix learned that trial witnesses such as Dennis Avant and Antwan Green were claiming that they were pressured by Officer Vagnini to testify, Pinix should have filed a postconviction motion seeking a new trial based on newly discovered evidence.

An initial problem with Lusk's claim is that the record contains no evidence that Pinix could have presented newly discovered evidence to the state courts during direct review. Lusk focuses on Avant's eventual recantation and Green's supposedly signing a notarized statement saying he was pressured by Vagnini. Regarding Avant, however, Pinix fully investigated his potential recantation and was unable to procure any evidence from him. When Avant contacted Pinix, Pinix arranged a meeting at which he intended to have Avant sign an affidavit containing his recantation. However, at the meeting, Avant decided to remain silent until he consulted with his own lawyer, and Pinix reasonably concluded that Avant's lawyer would advise him not to recant, as it would have exposed

21

him to perjury charges and an increase in his own criminal sentence. Because Avant proved unwilling to testify concerning the recantation, Pinix could not have performed deficiently by failing to bring a postconviction motion related to Avant's testimony.

As for Green, Lusk has not provided his notarized letter to the court, so I cannot find that Pinix could have used that letter to support a motion for a new trial. Moreover, Green was already exposed as a perjurer at trial, so Pinix could not claim that Green's perjury qualified as new evidence. Lusk claims that Green would have testified that Vagnini pressured him to testify falsely, but Pinix stated that he intended to interview Green about that, and Lusk does not claim that Pinix either failed to follow through on this intent or obtained information from Green that would have supported a postconviction motion.

In his brief, Lusk also asserts in conclusory fashion that three other individuals— Toriano Leavell, Brian Nash, and Brandon Williams—"contacted Pinix about Vagnini['s] attempts to coerce them into testifying." (Br. at 18; ECF No. 18.) However, Lusk does not allege that these men told Pinix that they would testify about such coercion at a postconviction hearing or that Pinix failed to investigate their allegations. Although Lusk has produced affidavits from Leavell and Williams concerning Vagnini, those affidavits were not signed until 2015, long after Lusk's direct appeal was over.

Finally, Lusk submits what purports to be Timothy Carter's statement, in which Carter admits to being the real killer of Brown. In the statement, Carter says that he tried to contact Pinix in 2012 about having been the real killer, and that Pinix contacted Carter's lawyer in response. Carter also states that his own lawyer advised him not to say anything. Nothing in the record indicates that Pinix was able to secure an affidavit from

22

Carter or an agreement for him to testify at a postconviction hearing. So again, Pinix did not have evidence to present in a postconviction motion on direct review.

Because Lusk has not shown that Pinix could have presented newly discovered evidence at a postconviction hearing on direct review, I cannot find that he performed deficiently by failing to file such a motion.

A second problem with this claim of ineffective assistance against Pinix is that Lusk eventually brought a postconviction motion in state court based on the newly discovered evidence, but the claim was unsuccessful. Lusk asserts that Pinix wrongly advised him that he could raise his claim involving Vagnini, Green, and Avant in a collateral attack on his conviction under Wis. Stat. § 974.06. Lusk contends that this was bad advice because the state courts would deem the collateral attack barred under *State v. Escalona-Naranjo*, 185 Wis. 2d 168 (1994). But Pinix's advice was accurate. *See State v. Love*, 284 Wis. 2d 111, 134 n.18 (2005) (holding that Wis. Stat. § 974.06 can be used to seek new trial based on newly discovered evidence discovered after the time for filing post-verdict motions has passed). Moreover, the state courts did not reject the newly-discovered-evidence part of Lusk's eventual motion under Wis. Stat. § 974.06 based on *Escalona-Naranjo*. Instead, the state trial court granted him a hearing on the claim, appointed counsel to represent him, and then rejected the claim after Lusk's witnesses failed to appear at the hearing. The Wisconsin Court of Appeals then affirmed the trial court's decision because Lusk did not produce a transcript showing that he had presented evidence warranting a new trial to the trial court.

23

Lusk does not explain how a postconviction motion filed by Pinix on direct review (*i.e.*, between 2011 and 2013) would have fared any better than the postconviction motion Lusk prosecuted with the assistance of appointed counsel in 2016 and 2017. Indeed, because in 2016–17 Lusk had the affidavit in which Avant recanted his testimony about witnessing the murder, which Pinix did not have during direct review, it is likely that Pinix's motion would have fared worse. Thus, even if I could find that Pinix performed deficiently in failing to file a postconviction motion based on newly discovered evidence (which I cannot), I could not find that Lusk suffered prejudice as a result. The outcome of the postconviction motion filed in 2016 shows that there is no reasonable probability that, had Pinix filed a postconviction motion in 2013 or earlier, Lusk would have been granted a new trial.

### b.    Failure to challenge effectiveness of trial counsel

Lusk claims that Pinix was also ineffective because he did not bring a postconviction motion alleging the two claims of ineffective assistance of trial counsel that I discussed above. Because I have concluded that trial counsel did not render ineffective assistance, I also conclude that Pinix could not have performed deficiently in failing to bring such a motion, and that Lusk could not have been prejudiced by his failure to do so. *See Martin v. Evans*, 384 F.3d 848, 852 (7th Cir. 2004); *Whitehead v. Cowan*, 263 F.3d 708, 731–32 (7th Cir. 2001).

### 2.    Appellate Capacity

Lusk also alleges that Pinix was ineffective in his appellate capacity because he did not challenge the trial court's admission of the identification evidence concerning Kimberly Neal and Jessica Garrett. Both Neal and Garrett identified Lusk as the killer of

Eric Garrett by picking him out of police lineups. Lusk contends that the lineups were unnecessarily suggestive. First, concerning Neal, Lusk points to evidence showing that, prior to the lineup in which she identified Lusk, Neal told the police that the shooter had a neck tattoo. Lusk contends that he was the only suspect in Neal's lineup with a neck tattoo, and that therefore the lineup was unnecessarily suggestive. Second, concerning Garrett, Lusk contends that she initially did not identify him in the lineup but later changed her answer and identified him after talking with a detective who knew that Lusk was the target of the lineup. Lusk contends that Garrett should not have been allowed to change her answer after viewing the lineup and meeting with the detective.

The trial court docket shows that trial counsel filed a motion to suppress the identifications (and an identification made by a third witness, Brittany Pendelton). (Answer Ex. 1-A, entry for July 23, 2010; ECF No. 16-1.) But the federal record does not contain a transcript of the suppression hearing or information about the parties' arguments or the court's ruling, other than the entry on the docket that I quoted in the background section, above. The docket entry states that the trial court denied the motion to suppress. At trial, Neal and Garrett identified Lusk as the shooter, and the prosecution introduced Garrett's out-of-court identification. The prosecution did not introduce evidence of Neal's out-of-court identification.

According to one of Pinix's letters to Lusk, Pinix initially intended to raise a challenge to Neal's identification on appeal, but he struck the argument once he learned that the state did not use her out-of-court identification. (Pet'r's Ex. 4; ECF No. 18-1.) Nothing in the record indicates whether Pinix ever considered bringing a challenge to

Jessica Garrett's identification. Lusk now contends that Pinix's failure to raise both challenges amounted to ineffective assistance.

When a criminal defendant alleges that his appellate counsel was ineffective in failing to raise an issue on appeal, the defendant generally must, to establish deficient performance, show that the unraised issue was both obvious and clearly stronger than the issues counsel did raise. *Walker v. Griffin*, 835 F.3d 705, 709 (7th Cir. 2016). To establish prejudice, the defendant must show a reasonable probability that, had counsel raised the issue, the result of the appeal would have been different. *Ramirez v. Tegels*, 963 F.3d 604, 613 (7th Cir. 2020).

Lusk has made no effort whatsoever to show that the issues involving Neal's and Garrett's identifications were clearly stronger than the issues Pinix actually raised on appeal. For this reason alone, Lusk is not entitled to habeas relief on this claim. Moreover, Lusk has not discussed the evidence that was presented at the suppression hearing in the trial court. Whether an appellate challenge to the identifications would have had merit depends on the evidence that the trial judge relied upon when she determined that the identifications were admissible. *See, e.g., State v. Hibl*, 290 Wis. 2d 595, 605 (2006) (appellate court reviews findings of fact made during suppression hearing for clear error). Although Lusk points to police reports that were prepared at the time of the identifications to try to establish that the identifications were suggestive, he does not show that these reports were admitted during the suppression hearing. More importantly, even an unnecessarily suggestive identification is admissible if the state can show that the identification is reliable. *See Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Powell v. State*, 86 Wis. 2d 51, 64–65 (1978). Thus, even if the police reports could be used to

26

establish that the lineups were unnecessarily suggestive, I still could not determine whether Pinix should have challenged the identifications because I would not be able to review the evidence that the state presented to the trial court to establish reliability.

Lusk contends that Pinix made a legal error when he wrote in his letter that he decided to strike his argument challenging Kimberly Neal's identification on the ground that the state did not use her out-of-court identification at trial. Lusk contends that the in-court identification could have been challenged as tainted by the unnecessarily suggestive out-of-court identification. While it is true that the in-court identification could have been challenged despite the state's decision not to introduce the allegedly suggestive out-of-court identification, it is generally harder to suppress an in-court identification. That is so because, as I previously indicated, the state can show that the in-court identification is admissible despite the suggestive out-of-court identification. *See Mason*, 432 U.S. at 114; *Powell*, 86 Wis. 2d at 64–65. And here, Lusk does not show that Pinix could have developed a strong argument that Neal's in-court identification was inadmissible.

In short, Lusk has not demonstrated that appellate claims challenging the identifications made by Neal and Garrett were clearly stronger than the claims Pinix actually raised. He therefore cannot show that Pinix performed deficiently. Moreover, Lusk has not shown a reasonable probability that, had Pinix raised these claims, the result of the appeal would have been different. Accordingly, Lusk is not entitled to relief on his claims of ineffective assistance of postconviction/appellate counsel.

**III. CONCLUSION**

For the reasons stated, **IT IS ORDERED** that Lusk's petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 24th day of March, 2022.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge